**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**WAYNE SCOTT SKIPPER,**

              Plaintiff,

**v.**

**CIVIL ACTION NO.: 1:16-CV-190
(KEELEY)**

**NANCY A. BERRYHILL,
Acting Commissioner of Social Security,**

              Defendant.

## <u>REPORT AND RECOMMENDATION</u>

### I.   <u>INTRODUCTION</u>

On September 26, 2016, Plaintiff Wayne Scott Skipper ("Plaintiff"), through counsel Jan Dils, Esq., of Jan Dils Attorneys at Law, L.C., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On December 5, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 4; Admin. R., ECF No. 5). On January 3, 2017, and February 1, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 8; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 10). On February 8, 2017, Plaintiff filed a Reply to the Commissioner's brief. (Pl.'s Reply to Def.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 12). The matter is now before the

undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.   PROCEDURAL HISTORY

On December 27, 2012, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB"), alleging disability that began on July 1, 2010. (R. 58, 176). Plaintiff's claim was initially denied on May 3, 2013, and denied again upon reconsideration on July 15, 2013. (R. 123, 131). After these denials, Plaintiff filed a written request for a hearing. (R. 138).

On November 24, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") Mary C. Peltzer in Charlottesville, Virginia. (R. 58, 67, 72, 140). Andrew V. Beale, an impartial vocational expert, appeared and testified in Charlottesville. (R. 58, 72, 157, 160-61). Plaintiff, represented by Ambria M. Adkins, Esq., of Jan Dils Attorneys at Law, L.C., appeared and testified in Cumberland, Maryland. (R. 58, 74-75). During the video hearing, Plaintiff amended his alleged onset date to January 2, 2013, the "day he had his heart attack." (R. 58, 77, 189). On February 18, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 55).

On April 17, 2015, Plaintiff requested that the Appeals Council review the ALJ's decision and submitted additional evidence for the Appeals Council to consider. (R. 2, 10-54, 366-79). Regarding the additional evidence dated after February 18, 2015, the

date of the ALJ's decision, the Appeals Council ruled that the evidence was not relevant because it "[did] not affect the decision about whether [Plaintiff was] disabled beginning on or before February 18, 2015." (R. 2). Regarding the additional evidence from Winchester Neurological Consultants dated November 1, 2014, through March 2, 2015, the Appeals Council ruled that the evidence was new and material and admitted it into the record. (Id.). Nevertheless, the Appeals Council "concluded that the additional evidence [admitted into the record did] not provide a basis for changing the [ALJ's] decision." (Id.). Therefore, on July 28, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.  __BACKGROUND__

### A.  **Personal History**

Plaintiff was born on April 23, 1963, and was forty-nine years old at the time he filed his claim for DIB. (See R. 105). He is 5'11" tall and weighs approximately 160 pounds. (R. 193). He is married and lives in a one-story house with his wife and one of his three children.[1] (R. 79-80). He has a general equivalency degree ("GED") but has not received any specialized, trade or vocational training. (R. 80, 194). His prior work experience includes working as a sheet metal mechanic/drafter. (R. 96). He alleges that he is unable to work due to the following ailments: (1) a right arm injury that required surgery in 2005; (2) a heart attack that occurred in December of 2012; (3) high blood pressure and (4) back problems. (R. 193).

---

[1] Plaintiff's children are all over the age of twenty-five. (R. 79).

**B.     Medical History**

**1.   Medical History Pre-Dating Alleged Onset Date of January 2, 2013**

On or about February 15, 2004, Plaintiff was shot in his right arm, near his elbow, with a forty-caliber pistol. (R. 330, 368). Afterwards, Plaintiff underwent surgery on his right arm. (R. 320). However, subsequent imaging of his right arm shows that metal fragments from the gunshot remain in his arm, in addition to a plate and screws. (See, e.g., R. 330).

**2.   Medical History Post-Dating Alleged Onset Date of January 2, 2013**

On January 2, 2013, Plaintiff presented to the emergency room at Western Maryland Health System, complaining of chest pain. (R. 246). Plaintiff stated that his chest pain was radiating to his left arm and that he was experiencing shortness of breath and nausea. (Id.). Plaintiff also stated that he had experienced similar episodes in the past few months. (R. 248). It was noted that Plaintiff was an active smoker and had smoked one pack of cigarettes per day for approximately thirty years. (Id.). It was further noted that Plaintiff "ha[d] not been seen by any health care provider for almost 10 years." (Id.). Plaintiff was ordered to undergo bloodwork, which revealed elevated cardiac enzymes. (Id.). As a result, Plaintiff was diagnosed with acute coronary syndrome and a myocardial infarction. (R. 251). Subsequently, Plaintiff was admitted into the primary care unit and a cardiology consult with Anil K. Singh, M.D., was requested. (Id.). On January 3, 2013, after his cardiology consult, Plaintiff underwent an "angioplasty of [his] mid and distal right coronary artery with [placement of] stents." (R. 253, 255, 262, 265). On January 5, 2013, Plaintiff was discharged from the hospital. (R.

262). He was encouraged to quit smoking and prescribed aspirin, Plavix, metoprolol, simvastatin and Protonix. (R. 265-66, 271).

On February 5, 2013, Plaintiff presented to Dr. Singh's office for a follow-up cardiology appointment. (R. 273). Dr. Singh noted that Plaintiff had "stopped Metoprolol and Simvastatin [and Protonix] by himself."[2] (Id.). Nevertheless, Dr. Singh documented that Plaintiff's angioplasty and stent placement had been "successful" and that Plaintiff was "doing well overall." (R. 273-74). Dr. Singh further documented that Plaintiff was attempting to cut down on his tobacco use but continued to smoke at least half a pack of cigarettes per day. (R. 273). At the end of Plaintiff's appointment, Dr. Singh diagnosed Plaintiff with significant tobacco use, dyslipidemia and coronary artery disease status post angioplasty and stent placement. (Id.). Dr. Singh ordered that Plaintiff resume his simvastatin and Protonix prescriptions and continue taking his aspirin and Plavix prescriptions. (R. 274).

On May 22, 2013, Plaintiff presented to Cumberland Cardiovascular Associates for an echocardiogram. (R. 276-77). The echocardiogram results were as follows:

- Concentric left ventricular hypertrophy[;]
- Left ventricular ejection fraction is 60%[;]
- Dilated biatrial cavities but free of thrombus[;]
- Normal appearing aortic, mitral, and tricuspid valves[;]
- Mild mitral, mild to moderate tricuspid regurgitation[;]
- Doppler evidence of mild to moderate pulmonary hypertension present. Doppler evidence suggestive of LV diastolic dysfunction also present[.]

Compared to previous study of 1/3/13, findings are more or less unchanged.

(R. 277).

---

[2] Plaintiff later reported that he had initially taken his metoprolol, simvastatin and Protonix prescriptions as ordered but that he did not get them refilled. (R. 279). It was noted that "money was not the issue, he just decided not to take them." (Id.).

On June 12, 2013, Plaintiff returned to Cumberland Cardiovascular Associates, complaining of chest pain. (R. 275). After taking nitroglycerin, Plaintiff reported that he felt "better." (Id.). After an examination, Plaintiff was instructed to start Protonix for acid reflux. (Id.). On June 21, 2013, Plaintiff followed up with Dr. Singh and underwent nuclear stress testing. (R. 279).

On July 9, 2013, Plaintiff was taken to the emergency room at Western Maryland Health System by emergency medical services. (R. 278). Plaintiff stated that he was picking up his grandson from his daughter's house "when he felt that he was being followed/stalked by a police officer." (R. 279). It was noted that Plaintiff "has severe anxiety and stress when he sees this particular police officer" and that he subsequently developed chest pain that radiated to his left arm. (Id.). After an echocardiogram, Plaintiff was diagnosed with a myocardial infarction and taken for a cardiac catheterization. (Id.). During the cardiac catheterization, it was noted that Plaintiff's two stents had "underdeployed." (Id.). Therefore, a balloon angioplasty of the two stents was performed, as well as a thrombectomy. (Id.). Plaintiff was admitted for hospitalization with the diagnoses of, *inter alia*, coronary artery disease, dyslipidemia, medical noncompliance and polysubstance abuse.[3] (Id.). On July 10, 2013, Plaintiff underwent another cardiac catheterization, in which his two stents were removed due to "apposition." (R. 296-97). On July 11, 2013, Plaintiff was discharged home with instructions to follow a cardiac diet and to enroll in a cardiac rehabilitation program. (R. 297-98). Plaintiff was also started on a new medication regimen of Effient, Crestor and Protonix, with which he agreed to comply. (R.289, 298).

---

[3] Plaintiff admitted to daily marijuana use and smoking one pack of cigarettes per day. (R. 279).

On March 25, 2014, Plaintiff returned to Western Maryland Health System for a six-month follow-up appointment. (R. 335). During this appointment, Plaintiff complained of chest pain, although it was noted that he "chops wood with no [cardiac] symptoms."[4] (R. 335-36). Therefore, Plaintiff was informed that his chest pain was "likely" related to his gastrointestinal system. (R. 336). Plaintiff was diagnosed with, *inter alia*, atypical chest pain. (Id.). Plaintiff was also diagnosed with depression after the following was noted:

> [Patient is f]ixated on perceived targeting by his local sheriff. Significant anxiety component. Recommend counseling and trial of SSRI. [An SSRI was prescribed] last time but [he did] not start [it].

(Id.).

On October 4, 2014, Plaintiff presented to the emergency room at Western Maryland Health System, complaining of chest pain. (R. 348). Plaintiff stated that he was playing with his dog when the chest pain began. (R. 349). A chest X-ray was ordered, which revealed no acute abnormalities. (R. 351-52). Therefore, Plaintiff was transferred to an observation unit and discharged the following day. (R. 352, 354). Later that month, on October 16, 2014, Plaintiff underwent a stress test, in which it was determined that Plaintiff's "risk of . . . myocardial ischemia [was] low." (R. 356). However, it was further determined that Plaintiff's ejection fraction was only twenty percent, a marked decrease from his previous level of fifty-eight percent on June 21, 2013, "likely [caused by] . . . cardiomyopathy." (Id.).

On January 7, 2015, Plaintiff presented to Western Maryland Health System for an "initial heart failure evaluation." (R. 362-63). After an examination, it was noted that

---

[4] During the administrative hearing, Plaintiff denied cutting any wood "since [his] heart attack." (R. 90). When asked if there was a mistake in his medical records, Plaintiff stated, "I guess. I have no idea." (Id.).

Plaintiff had been experiencing a progression of angina symptoms such as increased dyspnea, fatigue, nausea, palpitations and sweating. (R. 363). Plaintiff was diagnosed with cardiomyopathy, frequent ectopy and a worsening ejection fraction. (R. 362). However, it was documented that Plaintiff "refuse[d] to wear [a] life vest" or take his lisinopril and depression medication prescriptions, stating that "he does not want to prolong his life if it means he has to remain here and deal with the state police." (Id.). It was documented that a health care provider had been "able to discuss at length his heart function and possible [disease] progression if he does nothing and the benefits of treatment" but that, "[u]ltimately, [he] refuse[d] any further care." (Id.). Plaintiff was instructed to keep taking his carvedilol prescription, with which he agreed, and to appear for a cardiac catheterization later in the week, with which he "d[id] not know if he [would] follow through." (Id.).

### 3.  Additional Evidence: Medical Records from Winchester Neurological Consultants Dated November 1, 2014, through March 2, 2015[5]

On November 20, 2014, Plaintiff presented to Winchester Neurological Consultants to establish as a patient. (R. 360). During this visit, Plaintiff complained of numbness in his hands and feet. (Id.). After an examination, Plaintiff was diagnosed with limb numbness. (R. 361). Plaintiff was encouraged to quit smoking. (Id.). Plaintiff was also ordered to undergo bloodwork and electromyography ("EMG") of his left arm and right leg. (Id.). The EMG was performed on December 5, 2014. (R. 373). While the results were normal for Plaintiff's right leg, the results for Plaintiff's left arm revealed overuse syndrome. (R. 368, 373).

---

[5] These medical records were submitted to the Appeals Council upon Plaintiff's request for review and were accepted into the record.

On February 20, 2015, Plaintiff returned to Winchester Neurological Consultants for a follow-up appointment regarding his limb numbness. (R. 368). During this appointment, Plaintiff reported that "he has had back pain for years . . . and was told that he would eventually need surgery." (Id.). Plaintiff also reported that he continued to experience left arm numbness and a burning/tingling sensation in his feet. (Id.). An examination revealed diminished reflexes in his arms and knees. (R. 369). After the examination, it was noted that Plaintiff "did not get his labs completed that were ordered on [his] last visit." (R. 368). Therefore, Plaintiff's bloodwork was re-ordered. (R. 369). Additionally, Plaintiff was encouraged to quit smoking and offered a physical therapy consult to treat his overuse syndrome, which he declined. (Id.). Finally, Plaintiff was ordered to undergo venous pulse volume recordings of both of his legs and an MRI of his lumbar spine. (Id.).

### 4. Medical Reports/Opinions

#### a. Disability Determination Explanation by Saima Noon, M.D., May 2, 2013

On May 2, 2013, Saima Noon, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 105-12). In the Initial Explanation, Dr. Noon opined that Plaintiff suffers from two severe impairments: an acute myocardial infarction and essential hypertension. (R. 108). Dr. Noon further opined that Plaintiff suffers from two non-severe impairments: unspecified arthropathies and other diseases of the circulatory system. (Id.).

Dr. Noon also completed a physical residual functional capacity ("RFC") assessment of Plaintiff in the Initial Explanation. (R. 109-110). During this assessment,

Dr. Noon found that, while Plaintiff possesses no manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional and postural limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Noon found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (Id.). Regarding Plaintiff's postural limitations, Dr. Noon found that Plaintiff is able to frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl but only occasionally climb ladders/ropes/scaffolds. (Id.). After completing the RFC assessment, Dr. Noon determined that Plaintiff is able to perform medium-level work. (R. 111).

### b. Disability Determination Explanation by Fulvio Franyutti, M.D., July 11, 2013

On July 11, 2013, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 114-22). In the Reconsideration Explanation, Dr. Franyutti reviewed and "affirmed as written" all of Dr. Noon's findings from the Initial Explanation. (R. 120-21).

### C. Testimonial Evidence

During the administrative hearing[6] on November 24, 2014, Plaintiff testified regarding his work history. Most recently, Plaintiff worked for "Pro Semas," where he did the "drafting and drawing" of restaurant kitchen equipment. (R. 81). However, Plaintiff's

---

[6] During the administrative hearing, Plaintiff's counsel, Ms. Adkins, requested that Plaintiff undergo a physical consultative examination. (R. 175). On December 23, 2014, Ms. Adkins formalized her request, contending that a physical consultative examination was necessary "to fully develop the medical evidence." (Id.). However, the ALJ denied the request, reasoning that it was not supported by "the totality of the record" and that she possessed "sufficient [information] to provide a complete and accurate decision." (R. 58).

anxiety began affecting his work and "they noticed [his] work for them was dropping off."
(R. 95). He was laid off in 2011. (R. 83). Afterwards, he received unemployment
benefits but did not receive any interviews or job offers. (Id.).

Plaintiff testified that he suffers from multiple physical ailments, including cardiac
problems, low back pain, a right arm impairment and a neck impairment. Regarding
Plaintiff's cardiac problems, Plaintiff suffered a heart attack in January of 2011. (R. 84).
When describing his cardiac symptoms, he states:

> I don't know what's the matter with my heart, or what the problem even is.
> My legs give out, weak, hands and feet go numb. . . . I thought it was the
> heart because it's not pumping the way it's supposed to but I have no
> idea.

(Id.). Due to these symptoms, Plaintiff states, "I just never know what's going to happen
from day to day. One day I'm all right, and the next day I'm down and out." (R. 83).
Plaintiff experiences "down and out" days "a few times a week, sometimes even once a
day." (R. 84). On these occasions, he lays around the house. (R. 83). Plaintiff has a
prescription for nitroglycerin to treat any chest pain that occurs, which he has used twice
since his heart attack. (R. 92). He smokes half a pack of cigarettes per day. (R. 86).

Regarding his low back pain, Plaintiff has suffered from the pain since the 1980s.
(R. 85). He states:

> I had an MRI back in the '80s, and they said that my spinal column was
> too narrow for my spinal cord. . . . [T]hey said back then that -- if I had got
> an operation, that 50/50 chance I'd be able to do anything. So I didn't
> bother with it. I just dealt with the pain.

(Id.). Due to his low back pain, Plaintiff is unable to stand for "very long," sit for longer
than a half-hour or bend over for longer than a "few minutes." (R. 87-88). However,
Plaintiff states that he has "dealt with [his] back for years so [he has] more or less

learned to deal with that, [he] just watch[es] how [he] move[s]." (R. 87). To treat the

pain, Plaintiff soaks in a hot bath. (R. 85).

Regarding Plaintiff's right arm impairment, Plaintiff states that his right arm has

"always bothered [him]." (R. 84). He further states:

> The elbow locks sometimes and pinches the nerve. My wrist pinches the
> nerve. Something's the matter with the wrist. And that's as straight as it
> gets.

(Id.). Plaintiff explains that the pinched nerve causes a sharp pain that usually goes

away but sometimes lingers "like [he's] pulled it out of place or something." (R. 84-85).

Like his back pain, Plaintiff treats his right arm pain by soaking it in a hot bath. (R. 85).

Regarding his neck impairment, Plaintiff states that, while he suffers from neck pain, his

health care providers believe his neck impairment causes his hands to go numb and

that he is more bothered by his hand numbness than his neck pain. (Id.). However,

Plaintiff is able to use his hands "for buttons and zippers, . . . combing [his] hair,

grooming [his] beard, [etc.]" (R. 88).

In addition to physical ailments, Plaintiff testified that he suffers from mental

impairments. Specifically, Plaintiff suffers from difficulty concentrating, although he has

"no idea" why he is unable to concentrate. (R. 95). Additionally, he suffers from anxiety.

(R. 94). Plaintiff's anxiety stems from his "problems with law enforcement harassing

[him]." (Id.). Although he has a prescription for anxiety medication, he chooses not to

take it. (Id.).

Finally, Plaintiff testified regarding his routine activities. Plaintiff helps his wife

keep the house clean and "[k]eep[s] the yard done," using a riding lawnmower to mow

the grass. (R. 89, 93). He drives to pick up his grandson "about every day." (R. 80). He

12

watches movies and plays board games with his family. (R. 81). He lets his pet dog outside. (R. 91). Occasionally, he goes to one of his grandson's ball games or to a birthday party. (R. 92).

**D.   Vocational Evidence**

**1.  Vocational Testimony**

Andrew Beale, an impartial vocational expert, also testified during the administrative hearing. (R. 95-03). Initially, Mr. Beale testified regarding the characteristics of Plaintiff's past relevant work. (R. 96). Specifically, Mr. Beale testified that Plaintiff has worked as a sheet metal mechanic/drafter. (Id.). Mr. Beale characterized Plaintiff's duties as a sheet metal mechanic as medium-exertional, skilled work and his duties as a drafter as sedentary-exertional, skilled work.[7] (Id.).

After Mr. Beale described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Beale's consideration. (Id.). First, the ALJ asked Mr. Beale to:

> [A]ssume [an] . . . individual that is vocationally situated as the claimant, and that the hypothetical individual can perform all functions of medium work with frequent stairs and ramps, occasional ladders, ropes and scaffolds, and frequent balancing, stooping, kneeling, crouching and crawling.

(R. 96-97). The ALJ then asked Mr. Beale whether the hypothetical individual could perform Plaintiff's past work, to which Mr. Beale responded in the affirmative. (R. 97). Mr. Beale further responded that such an individual could also work as an industrial cleaner or a vehicle cleaner. (Id.).

Second, the ALJ asked Mr. Beale to:

---

[7] Mr. Beale later explained that, although Plaintiff's duties stemmed from two different Dictionary of Occupational Titles ("DOT") occupations, Plaintiff performed the duties in one "composite job." (R. 98).

> [A]ssume the hypothetical individual is not limited to work at a light exertional level. And now there should be no more than occasional stairs and ramps, no ladders, ropes or scaffolds. Occasional balancing, stooping, kneeling, crouching and crawling, and no more than occasional exposure to vibrations and respiratory irritants such as dust and fumes.

(R. 98). The ALJ then asked Mr. Beale whether the hypothetical individual could perform Plaintiff's past work. (Id.). Mr. Beale replied that such an individual could work as a drafter but not as a sheet metal mechanic. (Id.). Mr. Beale further replied that such an individual could also work as a recreation aide, stocker checker or mail sorter. (R. 98-99).

Third, the ALJ asked Mr. Beale to:

> [Assume] the hypothetical individual that was limited to work at a sedentary exertional level with the same additional non-exertional limitations from the first hypothetical[.]

(R. 90-00). The ALJ then asked Mr. Beale if the hypothetical individual could perform any work. (R. 100). Mr. Beale responded that such an individual could work as a drafter, inspector, assembler or hand packer/packager. (Id.).

After the hypothetical questions, the ALJ asked Mr. Beale questions regarding how much time employers generally allow employees to be unproductive. (R. 100-01). In response to these questions, Mr. Beale testified that employers generally allow an employee to: (1) have seventeen or eighteen days of unexcused/unscheduled absences per year; (2) take a ten- or fifteen-minute break during the first half of the workday, a meal break and a ten- or fifteen-minute break during the second half of the workday and (3) be off task only during break times. (Id.).

Plaintiff's counsel, Ms. Adkins, also presented questions for Mr. Beale's consideration during the administrative hearing. (R. 101-03). Specifically, Ms.

Adkins inquired about the requirements of a drafter position. (R. 101-02). First,

Ms. Adkins asked whether an individual could work as a drafter if he or she "were

limited to only frequent use of [his or her] hands for handling, fingering and

feeling" to which Mr. Beale responded in the negative. (R. 101). Second, Ms.

Adkins asked if a drafter would be able to sit or stand at will. (Id.). In response to

this question, Mr. Beale stated that:

> [The drafting table] can be changed . . . and it would allow for a person to
> sit or stand to do it. . . . [However,] I would say if you were required to
> make those changes more than every 30 minutes, that would pose a real
> problem in being able to get your work done in a timely fashion.

(R. 102).

### 2. Disability Reports

On March 21, 2013, Plaintiff submitted a Disability Report. (R. 192-01). In this

report, Plaintiff indicated that the following ailments limit his ability to work: (1) a right

arm injury that required surgery in 2005; (2) a heart attack that occurred in December of

2012; (3) high blood pressure and (4) back problems. (R. 193). He further indicated that

he stopped working on July 1, 2010, "[b]ecause of [his] conditions." (R. 194). Finally, he

indicated that he is prescribed the following medications: aspirin and Plavix for his heart;

metoprolol for hypertension; pantoprazole for acid reflux and simvastatin for high

cholesterol. (R. 196).

After Plaintiff submitted the Disability Report, Plaintiff's attorney, Ms. Dils,

submitted two Disability Report-Appeal forms on Plaintiff's behalf. (R. 217-29). On June

14, 2013, Ms. Dils reported that Plaintiff required assistance with bathing/showering,

getting dressed and performing household tasks. (R. 220). Ms. Dils also reported that

Plaintiff was unable to drive. (Id.). On August 29, 2013, Ms. Dils reported that, in the

previous month:

> [Plaintiff had been] experiencing a lot more emotional stress that triggers
> the heart attacks. [H]e has chest pain and sweatiness all the time. [H]e
> had another heart attack and [had] to be taken by ambulance to the
> hospital. [H]e had bypass surgery.

(R. 225). Ms. Dils further reported that, due to his increase in stress, Plaintiff "is

afraid to go out into the community." (R. 228). Finally, Ms. Dils updated Plaintiff's

list of medications to the following: aspirin and Nitrostat for his heart; citalopram

for depression; Crestor for high cholesterol; Effient for blood thinning and

pantoprazole for acid reflux. (R. 227).

**E.    Lifestyle Evidence**

**1.  Adult Function Report, April 23, 2012**

On April 23, 2012, Plaintiff submitted an Adult Function Report. (R. 202-09). In

this report, Plaintiff states that he is unable to work because:

> I am right handed and my right elbow was reconstructed. I have trouble
> using it in certain [situations]. My back goes out when bending, sitting or
> standing [too] long. I also recently had a heart attack.

(R. 202).

Plaintiff discloses that he is limited in some ways but not in others. In several

activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to

perform his own personal care and prepare simple meals, such as sandwiches. (R. 203-

04). He is able to wash dishes and "do some" yard work, although "nothing strenuous."

(R. 204-05). He is able to operate a motor vehicle and leave the house without

accompaniment. (R. 205). He is able to pay bills, count change, handle a savings

account and use a checkbook/money orders. (Id.). He is able to spend time with others,

complete tasks, handle changes in his routine and follow written and spoken instructions. (R. 206-08).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his impairments. Plaintiff's impairments affect his abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and use his hands. (R. 207). Plaintiff explains that, while he is able to walk "awhile" before needing to stop and rest on "a good day," he is generally unable to stand, walk or sit for "too long." (Id.). He further explains that he experiences difficulty using his right arm and that his right arm and back pain interfere with his sleep at times. (R. 203, 207). Plaintiff declares that he does not handle stress well. (See R. 208).

Finally, Plaintiff details his routine activities. While Plaintiff's daily routine varies according to his pain level, Plaintiff awakens and then gets dressed every morning. (R. 203). He prepares his own meals and washes dishes. (R. 204). He watches television "[s]everal times throughout the day" and visits with his family every day. (R. 206). He "do[es] not go out very often" but spends the majority of his time at home, although he does go outside "on [his] porch a lot." (R. 205-06). His daily medications include metoprolol, simvastatin and clopidogrel.[8] (R. 209).

### 2.  Personal Pain Questionnaire, April 11, 2013

On April 11, 2013, Plaintiff, with the help of his wife, completed a Personal Pain Questionnaire. (R. 209-14). In this questionnaire, Plaintiff declares that he suffers from right arm and chest pain. (R. 211-12). Regarding his right arm pain, Plaintiff characterizes the pain as aching and throbbing. (R. 211). He estimates that the pain

---

[8] In addition to these medications, Plaintiff is prescribed eyeglasses, which he uses for reading or "seeing things up close." (R. 208).

occurs "several times" a day. (Id.). He states that using his right arm aggravates the

pain. (R. 212). He further states that he does not do anything to relieve the pain

because "the pain [just] comes [and] goes." (Id.).

Regarding his chest pain, Plaintiff characterizes the pain as burning and

throbbing. (Id.). He estimates that the pain occurs once per week but that the pain does

"not [last] too long." (R. 213). He explains that his chest pain was worse before he had

stents placed in his heart. (Id.).

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement [of twelve
> months] . . . or a combination of impairments that is severe and meets the
> duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since January 2, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: coronary artery disease; myocardial infarction; status-post angioplasty and stenting procedures; hypertension (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) except: frequent stairs and ramps; occasional ladders, ropes and scaffolds; frequent balancing, stooping, kneeling, crouching and crawling.

6.      The claimant is capable of performing past relevant work as a drafter and shop working, skilled (SVP 7) and generally performed at the medium exertional level. This work does not require the performance of work-related activities precluded by the claimant's [RFC] (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, since January 2, 2013, through the date of this decision (20 CFR 404.1520(f)).

(R. 60-67).

## VI.     DISCUSSION

### A.     Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the Appeals Council erred in denying his request for review because he submitted additional evidence from Winchester Neurological Consultants dated November 20, 2014, and February 20, 2015, that constituted new and material evidence warranting remand. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 3-4, ECF No. 9). Plaintiff requests that the Court reverse the

Commissioner's decision and remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). (Id. at 6).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the Appeals Council properly determined that the medical records from Winchester Neurological Consultants do not provide a basis for changing the ALJ's opinion. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 7, ECF No. 11). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v.

Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis**

Plaintiff contends that the Appeals Council erred in denying his request for review because he submitted additional evidence from Winchester Neurological Consultants dated November 20, 2014, and February 20, 2015, that constituted new and material evidence warranting remand. (Pl.'s Br. at 3-4). Defendant contends that the Appeals Council properly determined that the medical records from Winchester Neurological Consultants do not provide a basis for changing the ALJ's opinion. (Def.'s Br. at 7).

"The Appeals Council must consider evidence submitted with [a] request for review in deciding whether to grant review if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision."[9] Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (internal citations omitted). In the instant case, the Appeals Council determined that Plaintiff's additional evidence from Winchester Neurological Consultants was new, material and related to the period of the ALJ's decision and included the evidence as part of the record but

---

[9] These are the requirements used by plaintiffs seeking a sentence-four remand to determine if the Appeals Council properly considered new evidence. They should not be confused with the requirements used by plaintiffs seeking a sentence-six remand on the basis of new evidence. See Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991) (stating that, for a sentence-six remand, a plaintiff must show that the evidence is new and material, establish good cause for failing to present the evidence earlier and make a general showing of the nature of the evidence).

nevertheless denied Plaintiff's request for review.[10] In its reasoning, the Appeals Council stated that Plaintiff's additional evidence from Winchester Neurological Consultants does not provide a basis for changing the ALJ's opinion. Therefore, this Court must now review the record as a whole, including Plaintiff's additional evidence, to determine whether substantial evidence supports the Commissioner's findings.[11] Id. More specifically, the Court must determine whether substantial evidence supports the Commissioner's step two findings, which Plaintiff challenges.

At step two, the ALJ determined that Plaintiff suffers from the following severe impairments: coronary artery disease; hypertension and myocardial infarction status-post angioplasty and stenting procedures. (R. 60). The ALJ further determined that Plaintiff suffers from several non-severe impairments, including a right arm impairment. (R. 60-61). The ALJ reasoned:

> [T]he medical evidence showed . . . [that Plaintiff's right arm impairment] involved minimal and conservative treatment, at best. He has not required any further surgery for his right arm, or even recent physical therapy or orthopedic evaluation for any musculoskeletal complaints. . . . The medical reports do not contain any specific complaints related to ongoing problems involving . . . his right arm . . . . There is a recent radiology report of the right arm that revealed findings consistent with his old fracture and repair, yet the limited physical exams routinely described he had normal strength (5/5) in all four extremities with no abnormal neurological findings. . . . The evidence as a whole does not include other objective findings or abnormalities involving the . . . extremities . . . . I have also reviewed the post-hearing report . . . that detailed some recent complaints of limb numbness, but there was no physical examination or EMG test result

---

[10] Precedent exists where courts have upheld an Appeals Council's decision to include new and material evidence as part of the record but to nevertheless deny review. See, e.g., Snider v. Colvin, No. 6:12-CV-00954, 2013 WL 4880158, at *5 (S.D. W. Va. Sept. 12, 2013) (explaining that the Appeals Council, upon accepting new and material evidence, is not required to remand the case but "must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings").

[11] In Plaintiff's Reply, Plaintiff clarifies that he is only contesting whether the record supports the Commissioner's decision, not whether the Appeals Council had a duty to further articulate its reasoning for denying review. (Pl.'s Reply at 1-2).

included with this report for consideration concerning these allegations . . . . Regardless, the above-referenced exam during a subsequent office visit in January 2015 failed to include any positive neurological or extremity findings . . . . In addition, these specific physical complaints do not cover a continuous period of 12 months to be considered a severe impairment, even if there was a formal diagnosis for a medically determinable impairment.

(R. 61).

Plaintiff contends that the additional evidence from Winchester Neurological Consultants, which reveals that Plaintiff underwent an "abnormal EMG test . . . confirming overuse syndrome in [left arm]," directly contradicts the ALJ's statement that "there was no . . . EMG test result . . . concerning [Plaintiff's arm] allegations." (Pl.'s Br. at 6). However, the ALJ was explaining that the record does not contain an EMG test result supporting Plaintiff's allegations of a *right* arm impairment, which remains true even upon consideration of Plaintiff's additional evidence. Plaintiff did not undergo an EMG test of his right arm. Instead, Plaintiff underwent an EMG test of his left arm.[12]

---

[12] Plaintiff points to Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011), which he states is "analogous to the case at hand," to support his contention that his additional evidence warrants remand. (Pl.'s Reply at 2; Pl.'s Br. at 4-6). However, in Meyer, the Fourth Circuit stated:

The ALJ emphasized that the record before it lacked 'restrictions placed on the claimant by a treating physician,' suggesting that this evidentiary gap played a role in its decision. Meyer subsequently obtained this missing evidence from his treating physician. That evidence corroborates the opinion of Dr. Weissglass, which the ALJ had rejected. But other record evidence credited by the ALJ conflicts with the new evidence. . . . Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

Meyer, 662 F.3d at 707 (4th Cir. 2011). In the instant case, despite Plaintiff's contentions, Plaintiff has not offered any evidence that conflicts with the ALJ's statements or with any other evidence in the record. Moreover, Plaintiff has not offered any restrictions or functional limitations that were not before the ALJ. Therefore, the instant case is factually distinguishable from Meyer.

Therefore, to the extent that Plaintiff is arguing that the additional evidence from Winchester Neurological Consultants conflicts with the ALJ's finding that Plaintiff's right arm impairment is not severe in nature, the undersigned finds that the argument lacks merit.

The undersigned also notes that, while the EMG test of Plaintiff's left arm showed overuse syndrome, Plaintiff did not allege a left arm impairment as the basis for his claim for DIB and neither Plaintiff nor his counsel discussed such an impairment during the administrative hearing. Therefore, if Plaintiff now wishes to assert a left arm impairment, the undersigned believes it would be more appropriate for Plaintiff to file a new claim for DIB and not to remand the instant claim.

Assuming *arguendo*, however, that Plaintiff's left arm impairment should have been considered at step two, the undersigned finds that such error is harmless in nature. At step two, a claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (citations omitted). After such a showing, an impairment will be considered severe when, either by itself or in combination with other impairments, it "significantly limits [a claimant's] physical or mental abilit[ies] to [perform] basic work activities." Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). Conversely, an impairment will be considered "'not severe' . . . if it [constitutes] a slight abnormality

which has such a minimal effect on the individual that it would not be expected to interfere with [basic work activities]." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521 (1985).

In the present case, Plaintiff has not met his burden of proving that he suffers from a left arm impairment that is severe in nature. While Plaintiff has established that he suffers from overuse syndrome of his left arm, a mere diagnosis is insufficient to prove a severe impairment. A showing of functional loss is needed, which Plaintiff has not provided. Plaintiff alleges no functional limitations that are caused by his left arm impairment.[13] Plaintiff also does not contest the ALJ's statements that "physical exams routinely described [Plaintiff] had normal strength (5/5) in all four extremities" and that Plaintiff "has not required . . . orthopedic evaluation for any musculoskeletal complaints." (R. 61).

Moreover, an ALJ's failure to find an impairment severe at step two is considered harmless if the ALJ continued through the remaining steps of the evaluation process and considered all of the claimant's limitations.'" Pierce, 2015 WL 136651, at *19. In this case, the ALJ found that Plaintiff suffered from several severe impairments and continued through the remaining steps of the evaluation process. As he moved through the remaining steps, the ALJ noted that, while Plaintiff was instructed that he "should not lift greater than [ten] pounds" for one week after his hospitalization in July of 2013, "follow-up reports did not continue to find that he should refrain from lifting, or indicate

---

[13] The only complaints in the record involving Plaintiff's left arm appears to be Plaintiff's statements that he experienced limb numbness that was not limited to his left arm, which the ALJ considered. (R. 61, 63) (discussing Plaintiff's complaints of limb numbness).

that he was additionally restricted regarding the performance of any other physical work-related activities . . . ." (R. 65). As previously discussed, Plaintiff offers no limitations caused by his overuse syndrome that the ALJ should have considered throughout the remaining steps. Therefore, any error that did occur was only harmless in nature. See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."). Consequently, the ALJ's decision is supported by substantial evidence and the Appeals Council did not err in determining that the additional evidence from Winchester Neurological Consultants failed to provide a basis for changing the ALJ's decision.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED,** the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in

waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 29th day of June, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE